# No. 20-3671

## In the
# United States Court of Appeals
## For the Eighth Circuit

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

KENNETH SCOTT MCKEE; CHARLES V. BALTZELL; CURTIS P. LANHAM,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Western District of Missouri
Honorable M. Douglas Harpool, District Judge
Honorable David P. Rush, Magistrate Judge
Case No. 3:18-cr-05043-MDH

———————————

## BRIEF OF APPELLEES

———————————

Thomas J. Bath, Jr.
Tricia A. Bath
BATH & EDMONDS, P.A.
10601 Mission Road
Suite 200
Leawood, KS 66206
(913) 652-9800

*Attorneys for Defendant
Lanham*

J. Justin Johnston
JOHNSTON LAW FIRM LLC
811 Grand Blvd., Suite 101
Kansas City, MO 64106
(816) 739-4538

*Attorney for Defendant Baltzell*

James R. Hobbs
Marilyn B. Keller
WYRSCH HOBBS &
MIRAKIAN, P.C.
One Kansas City Place
1200 Main St., Suite 2110
Kansas City, MO 64105
(816) 221-0080

*Attorneys for Defendant
McKee*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

On July 19, 2018, 17 people tragically lost their lives after *Stretch Duck 7* sank as severe high winds suddenly engulfed Table Rock Lake in an aberrant storm. The government indicted Appellees for violating 18 U.S.C. § 1115 and 46 U.S.C. § 2302(b) "within the admiralty jurisdiction of the United States." By virtue of those statutes' text and history and the government's charging language, the district court properly considered whether admiralty jurisdiction extends to Table Rock Lake. Applying this Court's binding precedent, the trial judge correctly determined it does not and dismissed the indictment for want of jurisdiction.

On appeal, the government professes surprise that the district court considered admiralty law, despite that being the government's charging language and theory in this case. The government now invokes 18 U.S.C. § 3231 or the Commerce Clause to support its prosecution. But § 3231 goes only to the court's *judicial* jurisdiction to adjudicate federal crimes. It does not resolve the relevant question of *legislative jurisdiction and prescriptive statutory reach:* the enumerated power Congress used to enact §§ 1115 and 2302, and the statutes' corresponding limits. As the district court correctly concluded, Congress acted on its general admiralty power to enact those statutes, meaning they only reach conduct within the general admiralty jurisdiction. Table Rock Lake is not in that jurisdiction.

Appellees request 20 minutes for oral argument.

i

# **TABLE OF CONTENTS**

Page

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ..........i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ...........................................................iv

STATEMENT OF THE ISSUES.........................................................1

JURISDICTIONAL STATEMENT .....................................................2

STATEMENT OF THE CASE ...........................................................2

I.      The government invoked admiralty jurisdiction in charging Appellees, and the grand jury returned the indictment explicitly premised on admiralty jurisdiction..............................2

II.     The government relied on admiralty jurisdiction when seeking to intervene in a related civil action. ...............................3

III.    The district court dismissed the indictment for lack of admiralty jurisdiction. ...............................................4

SUMMARY OF ARGUMENT ..........................................................6

ARGUMENT .................................................................................11

I.      The district court properly concluded the statutes are limited to admiralty jurisdiction, consistent with statutory text and history and how the government charged and argued the case. ...............................11

        A.      The District Court rightly determined the jurisdictional basis for and corresponding reach of the statutes. ...........................12

                1.      The government's grasping § 3231 argument demonstrates its fundamental misunderstanding of jurisdiction. ...............................12

                2.      The district court properly considered the statutes' legislative and prescriptive reach. ...........................15

        B.      Congress acted under its general admiralty power to promulgate §§ 1115 and 2302(b), meaning the general admiralty jurisdiction determines the statutes' reach.........................18

                1.      Congress's general admiralty power authorizes it to legislate to the extent allowed by the general admiralty jurisdiction. ...............................19

Appellate Case: 20-3671      Page: 3      Date Filed: 05/24/2021 Entry ID: 5038564

2. Congress enacted 18 U.S.C. § 1115 under its general admiralty power. ...........................................22

    a. Section 1115 was originally enacted in 1838 as an admiralty law. ........................................22

    b. Congress maintained this admiralty basis over two centuries. ...............................................26

    c. Section 1115 mirrors other admiralty laws. .................30

3. Congress enacted 46 U.S.C. § 2302(b) under its general admiralty power. .............................................32

II. The Commerce Clause cannot support this prosecution. ............................34

  A. By relying on the Commerce Clause instead of admiralty, the government seeks to constructively amend the indictment. ......................................................34

  B. The Commerce Clause does not provide any jurisdictional basis for the statutes. ....................................36

    1. Congress did not enact §§ 1115 or 2302(b) to regulate activity substantially affecting interstate commerce. ...............................................36

    2. No binding or persuasive authority establishes the statutes as commerce enactments. .....................41

    3. The government argues for an unprecedented expansion of the statutes' reach. .............................43

III. The statutes do not reach the charged conduct because Table Rock Lake is outside the general admiralty jurisdiction. ............................45

  A. Under this Court's binding precedent, Table Rock Lake is not navigable in fact. .............................................46

  B. Even assuming more than this Court's binding circuit precedent is required, Table Rock Lake is not navigable in fact. ......49

    1. The government tries to expand the applicable standard. ........50

    2. The government's tendered facts do not establish navigability in fact under the appropriate standard. .................54

CONCLUSION ........................................................56

Appellate Case: 20-3671    Page: 4    Date Filed: 05/24/2021 Entry ID: 5038564

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Montana Power Co.*,
  528 F.2d 437 (9th Cir. 1975) ...................................................... 21, 42, 51-52

*Am. S/A Frutas E Alimentos v. M/V Cap San Rafael*,
  426 F. Supp. 2d 312 (E.D. Pa. 2006) ............................................. 31

*Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*,
  709 F.3d 1055 (11th Cir. 2013) .................................................... 53

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) .................................................................... 13

*Bond v. United States*,
  572 U.S. 844 (2014) .................................................................... 45

*Butler v. Boston & S.S.S. Co.*,
  130 U.S. 527 (1889) .................................................................... 19

*Chapman v. United States*,
  575 F.2d 147 (7th Cir. 1978) ....................................................... 51

*Charnis v. Watersport Pro, LLC*,
  No. 2:07-CV-00623-RLHGWF, 2009 WL 2581699
  (D. Nev. May 1, 2009) ................................................................. 53

*Cleveland v. United States*,
  531 U.S. 12 (2000) ...................................................................... 34

*Cobb v. Aramark Sports & Ent. Servs., LLC*,
  933 F. Supp. 2d 1295 (D. Nev. 2013) ........................................... 53

*The Daniel Ball*,
  77 U.S. 557 (1870) .......................................................... 42-43, 50, 55

*Davis v. United States*,
  185 F.2d 938 (9th Cir. 1950) ....................................................... 42

*Dean v. Searcey*,
  893 F.3d 504 (8th Cir. 2018) ....................................................... 49

iv

*Edwards v. Hurtel*,
717 F.2d 1204 (8th Cir. 1983) (*Edwards I*)................................. 1, 10, 46-47, 53

*Edwards v. Hurtel*,
724 F.2d 689 (8th Cir. 1984) (*Edwards II*)............................................ 10, 47-48

*Finneseth v. Carter*,
712 F.2d 1041 (6th Cir. 1983) ....................................................................... 53-54

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................................................................................25

*In re Garnett*,
141 U.S. 1 (1891)........................................................................................20

*The Genesee Chief*,
53 U.S. 443 (1851)................................................................................24, 37

*George v. Beavark, Inc.*,
402 F.2d 977 (8th Cir. 1968) ..........................................................................53

*Gibbons v. Ogden*,
22 U.S. 1 (1824).........................................................................................37

*Godinez v. Jones*,
179 F. Supp. 135 (D.P.R. 1959) .......................................................................41

*Gonzales v. Raich*,
545 U.S. 1 (2005)............................................................................ 37-38, 40

*Goodman v. 1973 26 Foot Trojan Vessel, Arkansas Registration No. AR1439SN*,
859 F.2d 71 (8th Cir. 1988) ..........................................................................51

*Guilbeau v. Calzada*,
240 So. 2d 104 (La. Ct. App. 1970)...................................................................33

*Greta v. Surfun Enterprises, LLC*,
No. 09-CV-2793-JLS-(NLS), 2013 WL 12204908
(S.D. Cal. May 17, 2013)........................................................................ 32-33

*The Highland Light*,
12 F. Cas. 138 (C.C.D. Md. 1867)....................................................................24

v

Appellate Case: 20-3671    Page: 6    Date Filed: 05/24/2021 Entry ID: 5038564

*Jones v. Compagnie Generale Mar.*,
    882 F. Supp. 1079 (S.D. Ga. 1995) ............................................................. 30-31

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) .................................................................................. 19, 43

*Livingston v. United States*,
    627 F.2d 165 (8th Cir. 1980) ........................................... 1, 10, 21, 23, 30, 50-51

*Lockheed Martin Corp. v. Morganti*,
    412 F.3d 407 (2d. Cir. 2005) ....................................................................... 52-53

*The Lottawanna*,
    88 U.S. 558 (1874) ........................................................................................ 20

*Murray v. Hildreth*,
    61 F.2d 483 (5th Cir. 1932) ............................................................................ 20

*The New World*,
    57 U.S. 469 (1853) ......................................................................................... 24

*Panama R. Co. v. Johnson*,
    264 U.S. 375 (1924) ....................................................................................... 21

*PPW Royalty Trust by and through Petrie v. Barton*,
    841 F.3d 746 (8th Cir. 2016) ........................................................................... 4

*S. Pac. Co. v. Jensen*,
    244 U.S. 205 (1917) ................................................................................. 8, 19-20

*Sisson v. Ruby*,
    497 U.S. 358 (1990) ................................................................................... 21, 51

*Stirone v. United States*,
    361 U.S. 212 (1960) ....................................................................................... 35

*Stutzka v. McCarville*,
    420 F.3d 757 (8th Cir. 2005) ............................................................................ 4

*The Thomas Barlum*,
    293 U.S. 21 (1934) .................................................................................... 20-21

Appellate Case: 20-3671     Page: 7     Date Filed: 05/24/2021 Entry ID: 5038564

*Three Buoys Houseboat Vacations USA Ltd. v. Mort*s,
  921 F.2d 775 (8th Cir. 1990) ................................................................... 50, 52-54

*Torres v. Lynch*,
  136 S. Ct. 1619 (2016) ........................................................................7, 15

*United States v. Allied Towing Corp.*,
  602 F.2d 612 (4th Cir. 1979) ..................................... 1, 17, 20, 22, 28, 31-32, 41

*United States v. Anderson*,
  771 F.3d 1064 (8th Cir. 2014) .......................................................................46

*United States v. Appalachian Elec. Power Co.*,
  311 U.S. 377 (1940)........................................................................................48

*United States v. Beacham*,
  29 F. 284 (C.C.D. Md. 1886)....................................................................42, 44

*United States v. Coombs*,
  37 U.S. 72 (1838)............................................................................................42

*United States v. Enmons*,
  410 U.S. 396 (1973)........................................................................................44

*United States v. Flores*,
  289 U.S. 137 (1933)..............................................................................22-23, 30

*United States v. Gould*,
  536 F.2d 216 (8th Cir. 1976) .........................................................................48

*United States v. Holtzhauer*,
  40 F. 76 (C.C.D.N.J. 1889).......................................................................42, 44

*United States v. Jackson*,
  26 F. Cas. 559 (S.D.N.Y. 1841).............................................................42, 44

*United States v. Johnston*,
  353 F.3d 617 (8th Cir. 2003) .........................................................................35

*United States v. Kaluza*,
  780 F.3d 647 (5th Cir. 2015) ........................................................22-23, 26, 29

Appellate Case: 20-3671    Page: 8    Date Filed: 05/24/2021 Entry ID: 5038564

*United States v. LaBrecque,*
   419 F. Supp. 430 (D.N.J. 1976) ...................................................................42, 44

*United States v. Lopez,*
   514 U.S. 549 (1995) ...................................................................................7, 14

*United States v. Louper-Morris,*
   672 F.3d 539 (8th Cir. 2012) .............................................................................49

*United States v. Parker,*
   762 F.3d 801 (8th Cir. 2014) .............................................................................41

*United States v. Prado,*
   933 F.3d 121 (2d Cir. 2019) ........................................... 1, 13-14, 16, 33

*United States v. Reasor,*
   418 F.3d 466 (5th Cir. 2005) .....................................................................14, 16

*United States v. Ross,*
   74 F. Supp. 6 (E.D. Mo. 1947) .........................................................................43

*United States v. Ryan,*
   365 F. Supp. 2d 338 (E.D.N.Y. 2005) ....................................................... 26-27

*United States v. Springer,*
   866 F.3d 949 (8th Cir. 2017) .............................................................................13

*United States v. Tucker,*
   243 F.3d 499 (8th Cir. 2001) .............................................................................49

*United States v. Warner,*
   28 F. Cas. 404 (C.C.D. Ohio 1848) ............................................................ 22-23

*United States v. White Horse,*
   316 F.3d 769 (8th Cir. 2003) .............................................................................13

*United States v. Yeo,*
   739 F.2d 385 (8th Cir. 1984) .............................................................................35

*Yates v. United States,*
   574 U.S. 528 (2015) ...........................................................................................44

Appellate Case: 20-3671   Page: 9   Date Filed: 05/24/2021 Entry ID: 5038564

**Statutes and Legislative Documents**

18 U.S.C.

§ 7.................................................................................20, 28

§ 513.........................................................................................14

§ 892.........................................................................................40

§ 922(g)...................................................................................8-9

§ 922(q)....................................................................................14

§ 1115..............................................................................*passim*

§ 1201.......................................................................................39

§ 1651.......................................................................................14

§ 2117.......................................................................................39

§ 2314.......................................................................................39

§ 3231..............................................................................*passim*

21 U.S.C.

§ 841...........................................................................................9

§ 846...........................................................................................9

§ 801(3)....................................................................................40

46 U.S.C.

§ 2301................................................................. 3, 16-17, 33

§ 2302(a).................................................................................33

§ 2302(b)........................................................................*passim*

§ 2302(c).................................................................................33

§ 30701....................................................................................30

§ 30702....................................................................................30

§ 30707..............................................................................30-31

1874 Revised Statutes, Tit. LXX, Ch. 3, § 5344 (1875)........................28

Act of February 28, 1871, Chapter 100, 16 Stat. 440...........................27

Appellate Case: 20-3671     Page: 10     Date Filed: 05/24/2021 Entry ID: 5038564

Act of July 4, 1864, Chapter 249, 13 Stat. 390.......................................................26

Act of July 7, 1838, Chapter 191, 5 Stat. 304................................................... 22-25

Act of June 25, 1948, Chapter 645, 62 Stat. 683 .......................................................29

Act of Mar. 4, 1909, Chapter 321, 35 Stat. 1088.......................................................28

Federal Kidnapping Act, Chapter 271, 47 Stat. 326 (1932) .................................39

H.R. Rep. No. 80-304 (1947).................................................................................29

H.R. Rep. No. 98-338 (1983).................................................................................27

Larceny Act of 1915, Chapter 50, 37 Stat. 670 ................................................ 38-39

National Stolen Property Act, Chapter 333, 48 Stat. 794 (1934) ...........................39

Pub. L. No. 90-321, § 201, 82 Stat. 146 ...................................................................40

**Rules**

Fed. R. Civ. P. 52(a)(3).........................................................................................49

Fed. R. Crim. P. 12(b)...........................................................................................14

**Constitutional Provisions**

Const. Article III, § 2, cl. 1 ....................................................................................42

**Other Authorities**

Howard M. Wasserman, *Jurisdiction and Merits*,
    80 WASH. L. REV. 643, 646 (2005)............................................................ 15-16

Margaret H. Lemos, *The Commerce Power and Criminal*
    *Punishment: Presumption of Constitutionality or Presumption of*
    *Innocence?*, 84 TEX. L. REV. 1203 (2006)..................................................... 38-40

Wright & Miller, 14A Fed. Prac. & Proc. Juris. § 3671 (4th ed.) ..........................20

Appellate Case: 20-3671    Page: 11    Date Filed: 05/24/2021 Entry ID: 5038564

## STATEMENT OF THE ISSUES

Whether the district court correctly dismissed the indictment for lack of admiralty jurisdiction when: the government charged admiralty jurisdiction as the indictment's sole jurisdictional basis; Congress enacted the statutes that Appellees were charged with violating under its general admiralty power; and the statutes cannot reach the charged conduct because it occurred outside the general admiralty jurisdiction.

### Apposite Cases:

*Livingston v. United States*, 627 F.2d 165 (8th Cir. 1980).

*United States v. Prado*, 933 F.3d 121 (2d Cir. 2019).

*United States v. Allied Towing Corp.*, 602 F.2d 612 (4th Cir. 1979).

*Edwards v. Hurtel*, 717 F.2d 1204 (8th Cir. 1983) (*Edwards I*).

1

## JURISDICTIONAL STATEMENT

Appellees agree that the government timely appealed, and that this Court has jurisdiction to decide this appeal. The district court lacked general admiralty jurisdiction for the reasons stated herein.

## STATEMENT OF THE CASE

**I. The government invoked admiralty jurisdiction in charging Appellees, and the grand jury returned the indictment explicitly premised on admiralty jurisdiction.**

In 2018, *Stretch Duck 7* sank on Table Rock Lake after a derecho with winds over 70 miles per hour struck during a scheduled tour. DCD54 at 2; DCD42 ¶ 41. Seventeen passengers died. Adden. A2. Appellee Kenneth Scott McKee captained the boat during the tour, while Appellees Charles V. Baltzell and Curtis P. Lanham were managers at the tour company. DCD42 ¶¶ 7-9. The government filed an initial indictment against McKee, followed by a first superseding indictment adding Baltzell and Lanham, before filing the operative second superseding indictment against all three. *Id.*

In its 47-count indictment, the government charged each Appellee with violating 18 U.S.C. § 1115. DCD42 ¶¶ 47-54. That statute, first enacted in 1838, imposes criminal penalties on, in relevant part, "[e]very captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct,

Appellate Case: 20-3671    Page: 13    Date Filed: 05/24/2021 Entry ID: 5038564

negligence, or inattention to his duties on such vessel the life of any person is destroyed." § 1115.

The government also charged each Appellee with violating 46 U.S.C. § 2302(b). DCD42 ¶¶ 55-62. That provision makes it a misdemeanor to "operat[e] a vessel in a grossly negligent manner that endangers the life, limb, or property of a person." 46 U.S.C. § 2302(b). It applies only "to a vessel operated on waters subject to the jurisdiction of the United States" or, "for a vessel owned in the United States, on the high seas." *Id.* § 2301.

Throughout the operative second superseding indictment, and both superseded indictments, the government repeatedly alleged that the charged offenses occurred on "Table Rock Lake, a navigable water of the United States … within the admiralty jurisdiction of the United States." DCD42 ¶¶ 47, 48, 51, 53, 56, 58, 60; *see also* DCD54 at 3-4.

## II. The government relied on admiralty jurisdiction when seeking to intervene in a related civil action.

Parallel to these criminal proceedings, *Stretch Duck 7*'s owners sued in admiralty seeking exoneration from or limitation of liability for the accident. *See* Compl., *In re Branson Duck Vehicles, LLC*, No. 18-03339, Doc. 1 at 1 (W.D. Mo.

3

Oct. 15, 2018).[1]  The government moved to intervene in this civil action to "present[]
its position that Table Rock Lake … is a navigable water of the United States subject
to … admiralty jurisdiction."  Mot. to Intervene, *In re Branson Duck Vehicles*, Doc.
73 at 1 (W.D. Mo. Jan. 18, 2019).  The government represented to the district court
that the criminal indictment was "premised on the fact that Table Rock Lake was a
navigable water of the United States."  *Id.* at 2.  It further argued that the criminal
case, as a whole, was "premised on admiralty jurisdiction."  *Id.* at 3.  Indeed, the
government stated that the criminal case "was brought under the admiralty
jurisdiction of the United States due to the fact that Table Rock Lake, where the
sinking and loss of life occurred, was a navigable water of the United States."  *Id.* at
5.  The court denied intervention and ultimately dismissed the in rem civil action for
lack of admiralty jurisdiction.  Order, *In re Branson Duck Vehicles*, Doc. 311 at 4-5
(W.D. Mo. Nov. 27, 2019).

## III. The district court dismissed the indictment for lack of admiralty jurisdiction.

In the criminal case, Appellees moved to dismiss for lack of admiralty
jurisdiction.  In opposing the motion to dismiss, and consistent with the indictment's
charging language, the government held fast to its argument that admiralty

---

[1] This Court "may take judicial notice of judicial opinions and public records,"
*Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005), including
"proceedings in other courts that relate directly to matters at issue," *PPW Royalty
Trust by and through Petrie v. Barton*, 841 F.3d 746, 753 n.2 (8th Cir. 2016).

4

jurisdiction formed the jurisdictional basis for its prosecution. DCD65 at 22. But at the same time, although not alleged in the indictments, the government raised two additional, "separate and alternative theories in support of" jurisdiction: 18 U.S.C. § 3231 and the Commerce Clause.[2] *Id.*

On referral, and after a hearing at which the court received each party's exhibits, the magistrate judge recommended that the district court grant the motion to dismiss. Adden. A21. The district court adopted the magistrate's report and recommendation and granted the motion to dismiss. Adden. A22.

In the adopted report, the court distinguished between, on the one hand, its adjudicative authority over federal crimes under § 3231, and, on the other hand, the legislative or prescriptive jurisdiction cabining the scope of §§ 1115 and 2302(b). Adden. A4. Although § 3231 authorized the court to adjudicate federal criminal statutes in general, the court still had to consider whether *these statutes'* prescriptive reach covered the charged conduct. *Id.* Congress enacted both statutes under its general admiralty power, meaning general admiralty jurisdiction set both statutes' outer limits and they could only reach conduct on navigable-in-fact waters. *Id.* at 12-14, 18. Because Table Rock Lake was not navigable in fact under Eighth Circuit precedent and none of the facts proffered below supported a different outcome, the

---

[2] The government raised both grounds as to § 1115 and only the Commerce Clause as to § 2302(b).

Appellate Case: 20-3671    Page: 16    Date Filed: 05/24/2021 Entry ID: 5038564

court held that Appellees' charged conduct occurred outside the general admiralty jurisdiction. *Id.* at 14-18.

This result did not mean that the conduct fell outside the reach of *any* criminal prosecution. As the court observed, "[g]eneral police powers over crimes rightfully belong to the states," meaning the court could not "usurp the State of Missouri's general police power" without Congress's "explicitly directed application of federal law." *Id.* at 21. Because Congress had not sought to apply federal criminal law to Table Rock Lake, the court ruled that "[i]f Defendants are to be prosecuted for the tragedy on Table Rock Lake, the law requires that the prosecution be handled at the state level, and not in federal court." *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

This case is about admiralty jurisdiction. The government agreed, at least before receiving the adopted report and recommendation. Despite charging and pursuing this case under "the admiralty jurisdiction of the United States," DCD42 ¶ 47, the government argues to this Court that "questions of admiralty jurisdiction are irrelevant" and criticizes the district court for "invent[ing] a requirement" that the relevant statutes be "limited to the court's subject-matter jurisdiction under admiralty law." Br. 24, 26. Now eschewing admiralty, the government claims instead that it may prosecute any conduct with an effect on interstate commerce.

This position is a pure invention lacking precedent, logic, and well-reasoned support. If allowed, it would represent an unprecedented usurpation by the federal government of general police powers reserved to the states and an unwarranted expansion of the government's prosecutorial authority under centuries-old statutes of defined reach.

Rather than indulging the *Executive's* post-hoc efforts to expand the statutes, the district court rightly looked to the statutes as enacted by *Congress*. Congress— not the Executive—creates and defines federal criminal laws, and Congress must do so within the parameters of its legislative jurisdiction. Because Congress lacks a general federal police power, it may only enact criminal statutes "that are connected to one of its constitutionally enumerated powers." *Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016).

The Executive, for its part, prosecutes offenses created by Congress. In its brief extolling the Commerce Clause's reach, the government cites not one case holding that the Executive can change the constitutional basis on which Congress enacted a federal criminal offense or alter the scope of said offense beyond what Congress intended. Indeed, for obvious reasons, there are no such cases.

Here, the record of Congress's enactments and the Executive's charging language line up to demonstrate that the statutes at issue are limited to the general admiralty jurisdiction. As the court decided below, Congress enacted 18 U.S.C.

7

§ 1115 and 46 U.S.C. § 2302(b) under its general admiralty power—the "paramount" authority "to fix and determine the maritime law which shall prevail throughout the country." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 215 (1917), *superseded by statute on other grounds*, *Dir., Office of Workers' Compensation Programs, U.S. Dept. of Labor v. Perini N. River Assocs.*, 459 U.S. 297, 316 (1983). The statutes' language, history, and context compel this conclusion. Like other civil and criminal admiralty enactments, §§ 1115 and 2302(b) provide uniform rules and liability governing maritime commerce and are especially focused on commercial shipping.

Further, without a limitation to admiralty, § 1115 lacks *any jurisdictional limitation at all*. The statute would on its face apply to a canoeing accident on a Missouri farm pond, or an accident on a pleasure boat that was being refurbished on blocks on land. Congress did not (and could not) proscribe conduct with no nexus to its legislative authority. Recognizing § 1115's limitation to admiralty jurisdiction—as the government charged below and the district court reasoned—resolves that issue.

Although Congress *can* of course pass criminal legislation under its Commerce Clause power, when it does so it typically includes a clear nexus to the exercise of its commerce power in the statute, *see, e.g.*, 18 U.S.C. § 922(g) (unlawful possession of a firearm; listing requisite jurisdictional connections to "interstate or

8

foreign commerce"), or it makes explicit findings under its Commerce Clause authority, *see, e.g.*, 21 U.S.C. §§ 841 & 846 (setting out controlled substances violations).  Congress did neither, reaffirming that it was acting under—and limiting its action to—the general admiralty power.

The government would have this Court view the statutes at issue through a lens of what Congress *could do today* under the Commerce Clause if it so chose to act.  But the relevant question is not what Congress *could do* under its modern slate of constitutional powers—nor do Appellees concede that Congress could validly criminalize the charged conduct on Table Rock Lake under its commerce power. Regardless of what Congress *could* do today, the relevant question is what Congress *did do* when it passed the statutes in the 19th century.  The answer to the relevant question—as the district court concluded below—is that the statutes were passed pursuant to and are limited to the general admiralty jurisdiction, consistent with how the government itself charged and pursued this very case.

The government also argues—though only in back up to its primary Commerce Clause arguments—that even if the statutes apply only to the general admiralty jurisdiction, the district court erred in concluding that Table Rock Lake ("the Lake") is outside that jurisdiction.  In so arguing, the government would have this Court ignore or overturn two of its precedents.

Appellate Case: 20-3671     Page: 20     Date Filed: 05/24/2021 Entry ID: 5038564

The general admiralty jurisdiction is limited to waters that are navigable in fact. *Livingston*, 627 F.2d at 169-70. Under this Court's standard for navigability in fact, waters are navigable if they show "a present capability … to sustain *commercial shipping*." *Id.* (emphasis added). The district court correctly concluded that under this Court's binding precedent, the Lake is not navigable in fact. As this Court held in *Edwards I*, 717 F.2d at 1205, and *Edwards v. Hurtel*, 724 F.2d 689, 690 (8th Cir. 1984) (*Edwards II*), the Lake does not and cannot sustain commercial shipping. This Court's precedent therefore establishes that the Lake is not navigable in fact and ends the inquiry.

Even if this Court's precedent were not binding, as the government argues, the district court properly assessed the facts presented to it here—including all of the government's proffered evidence—and in the related civil action to decide that the Lake does not satisfy this Court's navigability-in-fact standard. The government shows no clear error in this conclusion. Instead, the government invites this Court to rewrite its navigability standard to deem sufficient *any* commercial activity, whether shipping or recreation. The government also asserts that physical capability for shipping, standing alone, suffices. Neither of the government's proposed revisions reflect this Court's binding rule, nor does either reflect the purposes of the general admiralty power. This Court requires a present susceptibility for use in commercial shipping—meaning a likelihood that commercial shipping will occur.

10

The Lake fails that standard.  The district court therefore properly dismissed the indictment, and this Court should affirm.

## ARGUMENT

The government's attempt to overturn the lower court's decision fails for several reasons.  First, § 3231's grant of judicial jurisdiction to the district court cannot control a federal criminal statute's prescriptive reach.  Second, under the Constitution, the relevant statutes are and have always been tethered to the general admiralty power and thus to admiralty jurisdiction.  Third, the government's post-hoc effort to create out of whole cloth a Commerce Clause foundation for this prosecution is devoid of legal support and contravenes congressional intent.  Fourth and finally, this Court's clear precedent and the district court's fact-finding show that Table Rock Lake is outside the admiralty jurisdiction.

## I.    The district court properly concluded the statutes are limited to admiralty jurisdiction, consistent with statutory text and history and how the government charged and argued the case.

From this case's inception, the government invoked admiralty jurisdiction. The government charged throughout all three indictments that this case fell within the general admiralty jurisdiction.  The government tried to intervene in the related civil case to argue that admiralty jurisdiction existed over the Lake.  Even when Appellees challenged that jurisdictional basis, the government continued to assert it.

11

Yet, on appeal, the government professes surprise that the district court analyzed the charged offenses under admiralty jurisdiction. Br. 22.

Given the government's decision to charge and pursue this case as falling under admiralty jurisdiction, it is neither surprising nor an error that the lower court considered statutory text and history, along with the explicit jurisdictional charging language used by the government, to determine whether admiralty jurisdiction was present.

### A. The District Court rightly determined the jurisdictional basis for and corresponding reach of the statutes.

Federal crimes require a statute-specific analysis of the jurisdictional limits that underlie each unique crime. As explained below, the text, history, and context of the two federal crimes in this case overwhelmingly support admiralty jurisdiction as delimiting federal authority to bring charges under the statutes in question.

### 1. The government's grasping § 3231 argument demonstrates its fundamental misunderstanding of jurisdiction.

As an initial matter, the government confuses federal jurisdiction over crimes with judicial jurisdiction to hear criminal cases when it argues that § 3231 provides an alternative basis for federal jurisdiction. Although that statute grants a federal court authority to hear a case, it does not decide the legislative, or prescriptive, jurisdiction underlying particular statutory crimes. The district court was correct in looking beyond § 3231.

12

Jurisdiction is "a word of many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006). "Among its possible meanings, the two here in contention" are (1) "judicial jurisdiction (or jurisdiction to adjudicate)" and (2) "legislative jurisdiction (or jurisdiction to prescribe)." *Prado*, 933 F.3d at 132-133. Judicial jurisdiction asks whether "the court possesses the legal power to adjudicate the case." *Id.* at 133. Legislative jurisdiction, in contrast, asks what power Congress invoked "to criminalize certain acts or to legislate over a particular field," and what conduct the legislation reaches consistent with that power. *United States v. Springer*, 866 F.3d 949, 954 (8th Cir. 2017); *see also Prado*, 933 F.3d at 133 ("Legislative, or prescriptive, jurisdiction concerns itself with the reach of a nation's … laws.").

For federal criminal statutes, § 3231 provides judicial jurisdiction. Under 18 U.S.C. § 3231, federal district courts "have original jurisdiction … of all offenses against the laws of the United States." Section 3231 thus gives federal courts statutory power to adjudicate prosecutions pursuant to federal statutes. *See*, *e.g.*, *United States v. White Horse*, 316 F.3d 769, 772 (8th Cir. 2003).

Although § 3231 is "the beginning and the end of the jurisdictional inquiry" into *judicial* jurisdiction, *id.*, it says nothing about *legislative* jurisdiction. The latter form of jurisdiction looks to the constitutional authority on which Congress acted in legislating and how that authority delimits the statutes' scope. *Prado*, 933 F.3d at

13

133; *see also United States v. Reasor*, 418 F.3d 466, 469 (5th Cir. 2005) ("Congress included the interstate commerce nexus [in 18 U.S.C. § 513] to ensure that it was acting within its legislative power and not as a limit on the judicial power of the courts.").

Some simple examples demonstrate the distinction. Imagine a federal statute proscribing possession of a gun within a certain distance of a school. *See United States v. Lopez*, 514 U.S. 549, 551 (1995). A district court may have § 3231 authority to adjudicate a prosecution under that statute because the statute is on its face an "offense[] against the laws of the United States." But that same statute can just as clearly exceed Congress's commerce authority, leading to the prosecution's dismissal for lack of legislative jurisdiction. *Id.* at 559-563 (invalidating 18 U.S.C. § 922(q) for exceeding Congress's commerce power). Similarly, a federal statute could be limited in jurisdiction to the "high seas" (*e.g.*, piracy under 18 U.S.C. § 1651). A district court would have § 3231 authority to adjudicate a prosecution under § 1651 alleging conduct occurred on the "high seas," but that prosecution would be subject to dismissal if the defense could demonstrate that the alleged conduct did not occur on the "high seas," *e.g.*, if it occurred on the Lake. *See* Fed. R. Crim. P. 12(b)(1)-(2).

The government implicitly agrees with this proposition, as it takes pains to ground §§ 1115 and 2302(b) in some form of congressional authority despite arguing

14

that § 3231 resolves the question presented.  And indeed, the government explicitly conceded below that § 3231 did not resolve the jurisdiction inquiry for the § 2302(b) offense.  *See* DCD90 at 71 (The government did not argue below that § 3231 applies to § 2302 because "§ 2302 combined with 2301 signify express congressional intent to tie that crime to offenses occurring only on waters subject to the jurisdiction of the United States.").

### 2. The district court properly considered the statutes' legislative and prescriptive reach.

Congress's legislative or prescriptive authority is thus distinct, and must be examined separately from, § 3231's adjudicative authority.  "Congress cannot punish felonies generally; it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers."  *Torres*, 136 S. Ct. at 1624.  A federal criminal statute, then, may only apply to conduct that Congress has the power and intention to regulate.  This fundamental limit placed on Congress under our federal system of government is contrasted with the states, which have always possessed a general police power.  The government does not dispute this fundamental proposition, nor could it.

Congress often explicitly identifies the jurisdictional basis for its legislation.  Congress may include a "jurisdictional element" in a criminal statute identifying the enumerated power that supports that statute's enactment and defines its reach.  *See Torres*, 136 S. Ct. at 1624-25; *see also* Howard M. Wasserman, *Jurisdiction and*

15

*Merits*, 80 WASH. L. REV. 643, 646 (2005) ("[T]rue 'jurisdictional elements' establish legislative power to create a cause of action.").  For example, a statute that Congress enacts based on its Commerce Clause power may—and, historically, did— explicitly require that the crime have an interstate nexus.  *Reasor*, 418 F.3d at 469.

Congress may also include an explicit limit on a statute's scope meant to advance "prescriptive comity" concerns.  *Prado*, 933 F.3d at 136-37.  For example, the Maritime Drug Law Enforcement Act (MDLEA) applies only to "covered vessels," including those "subject to the jurisdiction of the United States."  *Id.* at 127.  This element ensures that the statute is "tailored to exercise Congressional regulatory authority in circumstances where the regulatory interest of the United States is clear," while "avoid[ing] exercising regulatory authority where doing so would cause conflict with the sovereignty of other nations."  *Id.* at 136.

Because legislative jurisdiction must underlie every federal criminal enactment, §§ 1115 and 2302(b) must also reflect Congress's exercise of an enumerated power and a reach informed by that power.  The government again does not appear to dispute this point.

Indeed, § 2302(b) includes an explicit textual reference to its jurisdictional reach.  Like the MDLEA, § 2302(b) only "applies to a vessel operated on waters subject to the jurisdiction of the United States."  46 U.S.C. § 2301.  This provision both identifies the legislative authority Congress acted on to promulgate § 2302(b)—

16

its general admiralty power, *infra* at 2—and ensures that the statute only applies within the bounds of that authority.

Section 1115 does not have an explicit textual hook, but it must contain a jurisdictional limit to contain its broad criminal terms. *See Allied Towing*, 602 F.2d at 614 ("Since § 1115 itself contains no express jurisdictional language, we must look to its history in order to ascertain its reach."). Otherwise, the statute's plain text would apply to circumstances Congress cannot have intended (and cannot criminalize).

For example, if no legislative jurisdiction cabins the statute's reach, as the government now argues on appeal, the government could use § 1115 to prosecute crimes lacking any connection to an enumerated power. Imagine a Missouri resident who places a boat on high concrete blocks in his backyard to store for the winter and allows his children and their friends to play on the boat unsupervised. One of those children falls from the boat, suffering injuries that lead to her death. Section 1115's plain terms would permit the government to prosecute that Missouri citizen as an "owner" of a "vessel" whose "neglect" led to the child's death. No valid exercise of congressional power reaches that situation—there is no economic activity affecting interstate commerce or other tie-in to Congress's legislative powers. The same is true if the government were to use § 1115 to prosecute the "owner" of a canoe, *i.e.*,

17

a "vessel," whose alleged "neglect" causes an accident during his family fishing trip on a Missouri farm pond.

Other examples abound, but the point is not that the statute is unconstitutional because its terms could possibly reach conduct having no connection to an enumerated power. Rather, the point is that Congress *must* have enacted the statute based on an enumerated power, and that enumerated power informs what Congress intended as the statute's reach.

Despite its emphasis on § 3231, the government does not truly disagree with this proposition. The government instead disagrees about *which* enumerated power supports the statutes and decides their reach. In the government's view, the broadest form of the commerce power supports §§ 1115 and 2302(b), allowing the government to use the statutes to prosecute any conduct with a substantial effect on interstate commerce. *See* Br. 22, 38. While perhaps convenient to the government on appeal, this alternative jurisdictional theory fails to displace the statutes' deep roots in general admiralty jurisdiction.

**B.** **Congress acted under its general admiralty power to promulgate §§ 1115 and 2302(b), meaning the general admiralty jurisdiction determines the statutes' reach.**

The text, history, and context of §§ 1115 and 2302(b) show that Congress enacted each under its general admiralty power. As a result, the statutes can only

18

apply within the bounds of the general admiralty jurisdiction, as the government appeared to recognize below.

### 1. Congress's general admiralty power authorizes it to legislate to the extent allowed by the general admiralty jurisdiction.

The government ignores Congress's longstanding admiralty power and its exercise of that authority in enacting § 1115. The government's assertion that Congress used its commerce power to enact § 1115 relies on the thinnest of reeds: the statute does not include explicit "jurisdictional or geographical limitations." Br. 33. The government's construct simply cannot be squared with the statute's context and express terms showing that Congress acted on its general admiralty power, rather than a modern view of the Commerce Clause, to regulate safety on steamboats.

Contrary to the government's cramped view of Congress's admiralty authority, the Constitution grants Congress admiralty power over criminal and civil matters alike. The combination of (1) Article III's grant of judicial jurisdiction over admiralty and maritime cases and (2) Article I's Necessary and Proper Clause grants Congress its general admiralty power. *See Kaiser Aetna v. United States*, 444 U.S. 164, 172 n.7 (1979); *see also Butler v. Boston & S.S.S. Co.*, 130 U.S. 527, 557 (1889) ("As the constitution extends the judicial power of the United States to 'all cases of admiralty and maritime jurisdiction,' … the power of legislation on the same subject must necessarily be in the national legislature."). Under this authority, "Congress

19

has paramount power to fix and determine the maritime law which shall prevail throughout the country." *Jensen*, 244 U.S. at 215.

"[T]he congressional power to legislate in the field of admiralty [is] co-extensive with the field itself, and [does] not depend on Congress' commerce power." Wright & Miller, 14A Fed. Prac. & Proc. Juris. § 3671 (4th ed.) (citing *In re Garnett*, 141 U.S. 1, 12 (1891)). This power is also distinct from the statutorily defined "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 7. That special maritime jurisdiction is narrower than the general federal admiralty jurisdiction, as it "does not include navigable waters within the federal admiralty jurisdiction that are also within the territorial jurisdiction of a particular state." *Allied Towing*, 602 F.2d at 613-14. Special maritime jurisdiction stems from different constitutional grants, including Congress's "power to define and punish piracies and felonies committed on the high seas." *Murray v. Hildreth*, 61 F.2d 483, 484 (5th Cir. 1932).

Unlike the statutory special maritime jurisdiction, the general admiralty power stems from, and is coextensive with, "[t]he general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted." *The Lottawanna*, 88 U.S. 558, 574 (1874). In other words, the general admiralty jurisdiction that Article III, § 2 gives the federal courts is equal in scope to Congress's general admiralty power. *See The Thomas Barlum*, 293 U.S. 21, 43-

20

44 (1934) ("The Congress … has paramount power to determine the maritime law which shall prevail throughout the country. But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction."); *Panama R. Co. v. Johnson*, 264 U.S. 375, 386 (1924) ("[T]here is no room to doubt that the power of Congress extends to the entire subject [of maritime jurisdiction] and permits of the exercise of a wide discretion," but "there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects."). As a result, the district court properly looked to cases addressing the boundaries of the general admiralty jurisdiction.

That general admiralty power, like the general admiralty jurisdiction, "had its genesis in the felt need to provide a uniform body of law governing navigation and commercial maritime activity." *Livingston*, 627 F.2d at 169; *see also Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir. 1975) ("The purpose behind the grant of admiralty jurisdiction was the protection and the promotion of the maritime shipping industry through the development and application … of a uniform and specialized body of federal law."). In this vein, admiralty regulations are "concerned almost exclusively with the special needs of the shipping industry." *Livingston*, 624 F.2d at 169; *see also Sisson v. Ruby*, 497 U.S. 358, 362 (1990) ("[P]rotecting commercial shipping is at the heart of admiralty jurisdiction.").

21

"[A]dmiralty 'from the highest antiquity, has exercised a very extensive criminal jurisdiction, and punished offences by fine and imprisonment.'" *United States v. Flores*, 289 U.S. 137, 150 (1933). "The grant of admiralty and maritime jurisdiction to the federal government" therefore "includes the legislative power to define and punish crimes committed upon vessels lying in navigable waters of the United States." *Id.* at 151.

### 2. Congress enacted 18 U.S.C. § 1115 under its general admiralty power.

Since its initial enactment, § 1115 has reflected Congress's use of its legislative power over admiralty law. *See Allied Towing*, 602 F.2d at 615.

#### a. Section 1115 was originally enacted in 1838 as an admiralty law.

"The earliest precursor of § 1115 appeared in 1838 as part of an act to prevent boiler explosions on steamboats plying 'the bays, lakes, rivers, or other navigable waters of the United States.'" *Allied Towing,* 602 F.2d at 614; *see also* Act of July 7, 1838, ch. 191, § 12, 5 Stat. 304, 306. "At the time, travel by steamboat was commonplace, but so were steamboat collisions and boiler explosions resulting in the deaths of hundreds of passengers and crewmembers." *United States v. Kaluza*, 780 F.3d 647, 664 (5th Cir. 2015). The loss of human life was so great "that public feeling demanded such national legislation on the subject as would be effective in

preventing the recurrence of those calamities." *United States v. Warner*, 28 F. Cas. 404, 408 (C.C.D. Ohio 1848).

Responding to these concerns, Congress imposed uniform licensing and registration requirements on steamboats, along with penalties and liability on their owners and operators "to enforce the greatest possible vigilance and caution on the part of those concerned in steamboat navigation." *Id.*; *see also Kaluza*, 780 F.3d at 664. The 1838 Act, as a whole, therefore reflects the general admiralty power's primary concern: providing a "uniform body of law" focused on the shipping industry's "special needs." *Livingston*, 627 F.2d at 169.

Section 12 of the 1838 Act formed the earliest iteration of what is now § 1115. The provision made guilty of manslaughter "every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam" whose wrongdoing destroyed the life "of any person or persons on board." 5 Stat. at 306. This provision thus employed Congress's "legislative power to define and punish crimes committed upon vessels lying in navigable waters of the United States." *Flores*, 289 U.S. at 151.

Section 12 did not itself refer to "navigable waters," but its terms and context show that Congress meant for it to apply only on those navigable-in-fact waters subject to the general admiralty jurisdiction. By covering only steamboats or vessels powered by steam, the section focused on the types of vessels that would most

23

naturally be engaged in maritime commerce on navigable-in-fact waters. Those are also the types of vessels on which Congress focused other admiralty legislation. *See The Genesee Chief*, 53 U.S. 443, 451 (1851) (legislation extending federal courts' jurisdiction was supported by the admiralty power rather than Commerce Clause; statute provided jurisdiction over cases "arising in or upon or concerning steamboats" and similarly large vessels).

Other sections of the 1838 Act demonstrate that Congress exercised its general admiralty power to promulgate the entire Act. Section 13, for example, "provided a rule of evidence for actions against [steamboat] owners" brought by libellants seeking "redress in admiralty." *The Highland Light*, 12 F. Cas. 138, 139-40 (C.C.D. Md. 1867); *see also The New World*, 57 U.S. 469, 476 (1853) (admiralty case fell "within this section" of 1838 Act). Like § 12, § 13 did not explicitly reference navigable waters. Instead, it referred generally to "all suits and actions against proprietors of steamboats, for injuries arising to person or property from the bursting of the boiler of any steamboat." 5 Stat. at 306. This neighboring provision of the Act shows that Congress can exercise its general admiralty power without expressly discussing navigability.

Meanwhile, several other provisions of the Act imposed licensing requirements and penalties specific to particular bodies of water. For example, § 8 required steam vessel owners and masters transporting freight or passengers "at sea

24

or on the [Great] Lakes" to carry enough long-boats to safely rescue passengers or crewmembers. 5 Stat. at 305-06.

The government insists the Court conclude that by including these specific parameters in some sections but not in § 12, Congress intended for § 12 to have some unspecified general application untethered to admiralty law. Br. 32. There is no basis for that conclusion. On the contrary, these provisions demonstrate conclusively that the general admiralty power formed the authority for the entire Act, and that Congress simply narrowed application of that power for certain provisions. Congress did not promulgate a comprehensive statute with multiple provisions focused on admiralty, while implicitly and divergently employing its commerce power for one provision of that statute. *Cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

The Act shows that Congress invoked its general admiralty power to enact the entire statute, simply choosing to use that power more broadly in some provisions than in others. So in §§ 8 and 9, for example, Congress imposed fines only on those captaining steamboats on the Great Lakes and seas without sufficient lifeboats. It could have used its general admiralty power to impose the same fines more broadly—on, for example, all vessels traveling on other navigable waters within the

general admiralty jurisdiction—but it chose to take a more limited approach. In contrast, in § 12, Congress imposed liability for manslaughter coextensive with its general admiralty power. That provision thus applied to relevant persons on steamboats located within the general admiralty jurisdiction.

### b. Congress maintained this admiralty basis over two centuries.

As time went on and steamboat accidents continued, Congress broadened the persons subject to the provision. *See Kaluza*, 780 F.3d at 665. Yet Congress never lost or changed the original jurisdictional basis for the statute.

In 1864, Congress added "the owner or owners of any steamboat" or steam-propelled vessel, as well as "all public officers," to the list of persons liable for seaman's manslaughter. Act of July 4, 1864, ch. 249, § 6, 13 Stat. 390, 391.

In 1871, Congress again tweaked the statute, following "a particularly dismal period for steamboat accidents." *United States v. Ryan*, 365 F. Supp. 2d 338, 345 (E.D.N.Y. 2005). Congress repealed the 1838 Act and reenacted the seaman's manslaughter provision as part of a "significant[] overhaul[] [of] the regulatory regime governing steam-powered vessels." *Kaluza,* 780 F.3d at 665. The reenacted seaman's manslaughter statute, now § 57 of the 1871 Act, underwent only "minor changes." *Id.*; *see also* 13 Stat. at 391. It continued to apply to either (1) captains, engineers, pilots, or other persons employed on "any steamboat or vessel," or to (2) "any owner or inspector, or other public officer." The overall consistency in the

statutory text, along with the provision's placement within the larger statutory scheme, show that § 57 (like the broader Act) continued to stem from the general admiralty power.

Indeed, as Congress did with the 1838 Act, Congress sought through the 1871 Act to create "a coherent and unified body of maritime safety laws." *Ryan*, 365 F. Supp. 2d at 345 (quoting H.R. Rep. No. 98-338, at 137 (1983)). This effort reflects again Congress using its general admiralty power to provide uniform rules specific to the special problems that commercial steamboats posed. Also like the 1838 Act, the 1871 Act limited certain provisions to specific vessels on particular bodies of water. For example, § 47 applied only to "river steamer[s] navigating waters flowing into the Gulf of Mexico, and their tributaries." Act of February 28, 1871, ch. 100, § 47, 16 Stat. 440, 453-54.

And § 41 provided a more general limit on the entire statute reflecting and confirming its admiralty provenance. Under that section, the entire 1871 Act applied only to "steamers navigating the lakes, bays, inlets, sounds, rivers, harbors, or other navigable waters of the United States, when such waters are common highways of commerce, or open to general or competitive navigation." 16 Stat. at 453. This section identified the statute's admiralty basis by limiting its application to navigable-in-fact waters, but also stopped short of applying the full scope of the general admiralty power by excluding "public vessels" and "boats" on canals. *Id.*

27

As with the 1838 Act, then, it matters not whether this section referring to navigability applied to § 57 or whether Congress exercised the *full extent* of its admiralty power in all provisions of the 1871 Act. *Contra* Br. 31-32. What matters is that Congress was exercising its general admiralty power to enact the legislation, including the seaman's manslaughter provision. As a result, § 57 and its successors cannot apply outside the general admiralty jurisdiction.

This jurisdictional basis remained consistent throughout Congress's later revisions. In 1874, Congress enacted the Revised Statutes of the United States. Confirming the statute's grounding in admiralty, Congress placed the seaman's manslaughter statute in a chapter containing crimes restricted to the special maritime and territorial jurisdiction of the United States. *See* 1874 Revised Statutes, Tit. LXX, Ch. 3, § 5344 (1875). At that time, Congress had not enacted what is now 18 U.S.C § 7, defining the "special maritime and territorial jurisdiction of the United States." Instead, any statute confined to that narrow realm expressly contained that limitation. So the seaman's manslaughter statute, though it did not contain any such textual limit, was grouped with the more narrow crimes that did. *Allied Towing*, 602 F.2d at 614. It remained in that group when Congress enacted § 7's predecessor in the 1909 Criminal Code. Act of Mar. 4, 1909, ch. 321, §§ 272, 282, 35 Stat. 1088, 1142-44. Under that revision, the seaman's manslaughter statute could only apply

within the special maritime jurisdiction—a more restricted area than the general admiralty jurisdiction.

Congress changed that restriction in 1948 by removing seaman's manslaughter from the chapter governed by the special maritime and territorial jurisdiction. Act of June 25, 1948, ch. 645, § 1115, 62 Stat. 683, 757. In doing so, Congress demonstrated again that § 1115, since its inception, has stemmed from the general admiralty power and therefore reaches the outer limits of the general admiralty jurisdiction. Confirming this view, the 1948 revisor's note stated that now-§ 1115 "restore[d] the intent of the original enactments" that it be a provision "of general application." H.R. Rep. No. 80-304, at A91 (1947).

By "general application," Congress did not mean, as the government now argues, that § 1115 suddenly lacked any jurisdictional basis or corresponding prescriptive limits. No federal statute can go without either. *Supra* at 15. Instead, Congress meant that § 1115 had always been, and should continue to be, an expression of Congress's *general admiralty* power—not limited by the more restrictive bounds of the special maritime and territorial jurisdiction. But limits remained—those coextensive with the general admiralty jurisdiction.

Those limits persist in the statute's current form, which is essentially the same as it was throughout the 1900s. *Kaluza*, 780 F.3d at 665. Although § 1115 still does not refer to "navigability" or expressly invoke admiralty jurisdiction, it reads most

29

naturally as an admiralty enactment. It does not refer to "commerce" or interstate trade. Instead, it applies to conduct involving "steamboats" and "vessels," the historical targets of the admiralty power. And it imposes a uniform, nationwide standard of conduct, through criminal penalties, on those owning and operating such vessels. This legislation epitomizes how Congress uses its general admiralty power—and reflects that Congress consistently used that power in enacting, revising, and reenacting § 1115's forms over the last two centuries. *See Livingston*, 627 F.2d at 169-70; *Flores*, 289 U.S. at 150.

### c. Section 1115 mirrors other admiralty laws.

Comparing § 1115 to other admiralty enactments further confirms that § 1115 is grounded in admiralty. For example, the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 *et seq.*, includes both civil and criminal provisions that apply "to a carrier engaged in the carriage of goods to or from any port in the United States." *Id.* § 30702; *see also id.* § 30707. "Carriers," in turn, are those "water carriers" in charge of "a vessel." *Id.* § 30701.

Although this language, like § 1115's, plainly refers to maritime commerce, COGSA has no express "navigability limitation." Br. 33. Nor does it explicitly invoke the general admiralty jurisdiction. Even so, courts consistently treat COGSA "[a]s federal legislation in admiralty." *Jones v. Compagnie Generale Mar.*, 882 F. Supp. 1079, 1082 (S.D. Ga. 1995). Just as with § 1115, courts hold that COGSA

30

was "clearly designed to protect the shipping industry." *Id.* As a result, it "applies to all [admiralty] disputes arising out of navigable waters." *Am. S/A Frutas E Alimentos v. M/V Cap San Rafael*, 426 F. Supp. 2d 312, 316 (E.D. Pa. 2006). It also imposes criminal penalties for violations arising out of the same. *See* 46 U.S.C. § 30707. This Court should take the same view of § 1115.

The Fourth Circuit has already adopted this view. *Allied Towing* contains the most thorough discussion of the statute's origins and legislative basis by a federal court. In *Allied Towing,* the government initially failed to specify any legislative basis for its prosecution, alleging simply that the § 1115 violation occurred "within the jurisdiction of [the] Court." 602 F.2d at 613. The district court dismissed that indictment for lack of jurisdiction. *Id.* Only then did the government charge in a second indictment that the offense occurred on "a navigable water of the United States … within the admiralty jurisdiction of the United States." *Id.* The defendant argued that the special maritime and territorial jurisdiction limited § 1115's scope, while the government countered that the broader general admiralty jurisdiction controlled. *Id.* at 613-14.

Examining § 1115's history led the appeals court to conclude "that Congress enacted [§ 1115] as an integral part of its regulation of the nation's maritime commerce." *Id.* at 615. As a result, the Fourth Circuit held, the statute "reaches

homicides committed anywhere within the general admiralty jurisdiction of the federal court." *Id.*

The government argues that this on-point, persuasive precedent is dicta. Br. 28. But § 1115's legislative reach formed the central inquiry in *Allied Towing*. As in this case, § 3231 provided judicial jurisdiction over the prosecution. 602 F.2d at 614. But the court still had to decide whether § 1115 applied to the charged conduct. To do so, the court had to determine whether Congress exercised its general admiralty power to enact § 1115 or instead imposed the narrower limits of the special maritime and territorial jurisdiction on the provision. *Id.* at 615.

As *Allied Towing* holds, § 1115's text and history, along with its parallels to similar statutes, show that Congress acted on its general admiralty power to enact the statute. The statute thus applies within the constraints of that power—to the outer limits of the general admiralty jurisdiction.

### 3. Congress enacted 46 U.S.C. § 2302(b) under its general admiralty power.

Section 2302(b), like § 1115, reflects Congress's use of its general admiralty power to impose uniform maritime safety regulations and criminal liability for violating those regulations. Since its initial enactment as part of the Motorboat Act of 1940, § 2302, as a whole, has "embodie[d] a fundamental and clearly established public policy of promoting maritime safety." *Greta v. Surfun Enterprises, LLC*, No. 09-CV-2793-JLS-(NLS), 2013 WL 12204908, at *5 (S.D. Cal. May 17, 2013).

32

Section 2302(b) makes it a Class A misdemeanor for a person to "operat[e] a vessel in a grossly negligent manner that endangers the life, limb, or property of a person." Its neighboring provisions also provide uniform regulations aimed at maritime safety. Section 2302(a), for example, imposes civil penalties for negligent vessel operation, while § 2302(c) applies either a civil penalty or misdemeanor liability to a person operating a vessel under the influence of alcohol or drugs.

All of these provisions not only appear within a chapter regulating maritime liability, but also apply only to "vessel[s] operated on waters subject to the jurisdiction of the United States." 46 U.S.C. § 2301. Section 2302(b) thus includes an express prescriptive limit that (1) reveals its roots in the general admiralty power and (2) describes the resulting reach of the statute. *Supra* at 16; *cf. Prado*, 933 F.3d at 136. The entire statute therefore reflects an inherently maritime character. As a result, courts view § 2302(b) and its sister provisions as invoking the general admiralty jurisdiction. *See Greta*, 2013 WL 12204908, at *2, 5 (seaman raised wrongful termination claim "squarely within § 1331(1)'s grant of federal admiralty jurisdiction" that survived 12(b)(6) motion because plaintiff "was discharged . . . for refusing to violate [§ 2302,] a statute that sets forth a substantial and fundamental public policy of maritime safety."); *Guilbeau v. Calzada,* 240 So. 2d 104, 107 (La. Ct. App. 1970) (court had admiralty jurisdiction over motorboat operators' violations because collision "occurred on navigable waters of the United States").

33

Section 2302(b)'s text and context thus establish that it stems from the general admiralty power and applies within the limits of the general admiralty jurisdiction on navigable-in-fact waters within the jurisdiction of the United States.

## II.   The Commerce Clause cannot support this prosecution.

In indicting this case, the government and grand jury charged the general admiralty jurisdiction as the jurisdictional basis for this prosecution.  Now, the government would instead rely on the Commerce Clause.  The government's effort to rely on a different jurisdictional basis than that found by the grand jury at a minimum constitutes a constructive amendment of the indictment.  Even if the government's attempt to alter its indictment were permissible (and it is not), the Commerce Clause does not supply legislative jurisdiction for the relevant statutes. Nor can the Executive post-hoc imagine a basis for congressional action that did not exist at the time of that action.  *Cf. Cleveland v. United States*, 531 U.S. 12, 24 (2000) ("We resist the Government's reading of [the statute] because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress.").

### A.   By relying on the Commerce Clause instead of admiralty, the government seeks to constructively amend the indictment.

The government and grand jury charged general admiralty jurisdiction as an element of the alleged offenses.  DCD42 ¶¶ 47, 48, 51, 53, 56, 58, 60.  Specifically, with respect to each count, the government charged that the alleged offenses

34

occurred on "a navigable water of the United States … within the admiralty jurisdiction of the United States." *Id.* Now, the government all but abandons this charging language to focus on the Commerce Clause and the claim that the statutes require no jurisdictional hook whatsoever. Br. 22.

But Appellees "cannot be tried on charges that are not made in the indictment." *United States v. Yeo*, 739 F.2d 385, 387 (8th Cir. 1984); *see also Stirone v. United States*, 361 U.S. 212, 217 (1960). "[W]hen the essential elements of the indicted offense are altered, either actually or in effect, after the grand jury has issued the indictment," a constructive amendment occurs. *United States v. Johnston*, 353 F.3d 617, 623 (8th Cir. 2003). "A constructive amendment of an indictment is prejudicial *per se*." *Yeo*, 739 F.2d at 387. The general admiralty power supports §§ 1115 and 2302(b) (though it does not extend to the factual circumstances of this case), the general admiralty jurisdiction determines the reach of those statutes, and the government explicitly charged that jurisdictional basis. The government's attempt to abandon that express and repeated charge of admiralty jurisdiction in favor of the Commerce Clause forms a constructive amendment that prejudices the Appellees by the prospect of being tried on charges other than what the grand jury returned. The government can no more post-hoc reimagine the basis on which the grand jury acted than it can post-hoc reimagine the basis on which Congress acted.

35

**B.    The Commerce Clause does not provide any jurisdictional basis for the statutes.**

The government's brief reads like a laundry list of every conceivable "commercial" activity it can think of that occurs in or around the Lake. Br. 13-18. But its lengthy recitation adds nothing because the question is not a hypothetical—what Congress *could* regulate under the Commerce Clause—but rather the actual question of what Congress *did* regulate when it passed the relevant statutes. Crucially, the government does not identify any binding or persuasive authority showing that § 1115 or § 2302(b) were commerce enactments—much less enacted based on a substantial-effects-on-commerce framework. Instead, the government urges this Court to be the first to apply the statutes to non-navigable-in-fact waters and argues that because the statutes do not expressly reference the general admiralty power, and the charged conduct purportedly exerts a substantial effect on interstate commerce, Congress must be given the benefit of the doubt under the commerce power. The government's chain of inferences not only ignores the statutes' plain import, but also wrongly forces these historical enactments into a modern commerce framework.

**1.    Congress did not enact §§ 1115 or 2302(b) to regulate activity substantially affecting interstate commerce.**

At the outset, the government muddles the relevant inquiry by arguing at length that Congress *could* validly regulate activity on the Lake under its commerce

36

power.  Br. 37-40.  But the relevant question is whether Congress *did so*.  The government cites no case stating that courts can supply a constitutional basis for a federal criminal offense other than what Congress actually used in creating the offense.  *Cf. The Genesee Chief*, 53 U.S. at 452 ("If the constitutionality of this law is supported as a regulation of commerce, we shall impute to the legislature the exercise of a power which it has not claimed under that clause of the Constitution; and which we have no reason to suppose it deemed itself authorized to exercise.").

The government also missteps by seeking to graft a modern view of the commerce power onto centuries-old statutes lacking any resemblance to commerce enactments.  The judicial "understanding of the reach of the Commerce Clause, as well as Congress' assertion of authority thereunder, has evolved over time." *Gonzales v. Raich*, 545 U.S. 1, 15-16 (2005).  In the Constitution's first century, Congress primarily used the Clause "to preclude the kind of discriminatory state legislation that had once been permissible." *Id.* at 16.  Congress did not use its commerce power to regulate broadly any activity exerting a substantial effect on interstate commerce.  For example, in *Gibbons v. Ogden*, the Court struck down New York legislation granting individuals licenses for "exclusive navigation" of New York waters.  22 U.S. 1, 210-211 (1824).  In doing so, the Court asserted that the power to regulate commerce includes the power to regulate navigation.  *Id.* at 193.  But it viewed this power over navigation in the context of preventing state

37

interference with interstate commerce—not in the context of broadly regulating commercial activity. *See id.* at 210-11. *Gibbons* reflects that when Congress enacted the 1838 statute containing § 1115's predecessor, a more narrow view of the commerce power prevailed.

Only in the late 19th century—decades after the 1838 Act's promulgation—did Congress begin a "new era" of commerce regulation. *Raich*, 545 U.S. at 16. That era spawned a more expansive view of the commerce power, one that now includes "regulat[ing] activities that substantially affect interstate commerce." *Id.* at 17.

Not only was § 1115 enacted before this modern era of commerce regulation, neither §§ 1115 nor 2302(b) parallels the statutes in which Congress has used its modern, "substantially affects" commerce authority. Central to the government's anachronistic argument is its view that the statutes' lack of an express admiralty nexus means they must be Commerce Clause enactments. But "until relatively recently criminal Commerce Clause statutes tended overwhelmingly to contain jurisdictional elements." Margaret H. Lemos, *The Commerce Power and Criminal Punishment: Presumption of Constitutionality or Presumption of Innocence?*, 84 TEX. L. REV. 1203, 1227 (2006). Yet, as the government concedes, §§ 1115 and 2302(b) lack a Commerce Clause jurisdictional element.

As a result, the statutes look nothing like historical commerce legislation in the criminal realm. Take, for instance, the Larceny Act of 1915, punishing whoever "unlawfully break[s] the seal of any railroad car containing interstate or foreign shipments." ch. 50, 37 Stat. 670 (codified as amended at 18 U.S.C. § 2117 (2000)). Similarly, the National Stolen Property Act made it a crime to "transport or cause to be transported in interstate or foreign commerce" stolen property. ch. 333, 48 Stat. 794 (1934) (codified as amended at 18 U.S.C. § 2314 (2000)). The Federal Kidnapping Act also contained an express interstate commerce nexus, imposing criminal liability on those transporting "in interstate or foreign commerce, any person who shall have been unlawfully seized." ch. 271, 47 Stat. 326 (1932) (codified as amended at 18 U.S.C. § 1201 (2000)). The stark difference between these federal criminal statutes and §§ 1115 and 2302(b) confirms that Congress did not intend the latter as commerce enactments.

Even taking a more modern view of commerce enactments, the statutes do not reflect Congress's approach to legislating in this area. Not until the 1960s—decades after the Motorboat Act and more than a century after the 1838 Act—did Congress enact the first criminal statutes "that prohibited conduct defined entirely without reference to interstate commerce, based solely on congressional findings." Lemos, *supra*, at 1227. For example, the Consumer Credit Protection Act of 1968 lacked an express jurisdictional element but prohibited "extortionate credit transactions" based

on "Congress's findings that … extortionate credit transactions … are carried on 'to a substantial extent in interstate and foreign commerce'" or "directly affect interstate and foreign commerce." *Id.* at 1211 n.35; *see also* Pub. L. No. 90-321, § 201, 82 Stat. 146, 159 (codified as amended at 18 U.S.C. § 892 (2000)).

Congress also enacted the Controlled Substances Act with explicit findings linking its regulation of controlled substances to interstate commerce. *Raich*, 545 U.S. at 20-21. In Congress's view, "[a] major portion of the traffic in controlled substances flows through interstate and foreign commerce," thus supporting its regulation of the same. 21 U.S.C. § 801(3). Contrary to the government's take on the Act, *see* Br. 37, that statute shows that even when Congress does not include an express jurisdictional element, it acts on a specific basis of legislative authority, which it identifies with express findings that the regulated activity affects interstate commerce.

Sections 1115 and 2302(b) contain no congressional findings of an interstate commerce impact, and the government identifies none in its argument. Congress could not have enacted these provisions on a "substantial effects" basis, as that framework *did not exist* at the time of enactment. The government urges this Court to imagine interstate nexus findings that Congress never and could not have made. The statutes should instead be viewed in their own historical context, in which Congress did not take the modern expansive view of its commerce power and,

40

consistent with its contemporary practice, would have included an express interstate nexus or findings if it was employing that power.

Read in their proper context, the statutes stand as Congress originally intended them: admiralty enactments. "Congress intended … § 1115 to reach violations occurring anywhere within the general admiralty and maritime jurisdiction of the federal courts." *Allied Towing*, 602 F.2d at 614. And § 2302(b), like the Motorboat Act from which it evolved, "cannot, by any stretch of the imagination, be considered as an 'Act of Congress regulating commerce.'" *Godinez v. Jones*, 179 F. Supp. 135, 140 (D.P.R. 1959). Text, history, and precedent all support this conclusion.[3]

> ### 2. No binding or persuasive authority establishes the statutes as commerce enactments.

In relying on the Commerce Clause, the government identifies a handful of cases in which courts have described the statutes as commerce enactments despite their dissimilarity to such provisions. None of this authority is binding on this Court as to §§ 1115 or 2302(b). And none of it is persuasive, as it simply reflects a conflation of the commerce and admiralty powers. At most, these decisions show that early courts used the same definition of navigability for commerce and admiralty cases—meaning enactments under either authority had the same legislative reach.

---

[3] Should this Court view the statutes as ambiguous, moreover, it should construe them in the defendants' favor. *United States v. Parker*, 762 F.3d 801, 808-09 (8th Cir. 2014).

So if these cases have any import, it is to confirm that Congress intended for §§ 1115 and 2302(b) to reach only navigable-in-fact waters.

Nineteenth-century case law often overlooked Congress's separate legislative admiralty power.  *See, e.g.*, *The Daniel Ball*, 77 U.S. 557, 564 (1870).  And the decisions the government cites did the same in addressing the legislative authority for the 1838 Act.  *United States v. LaBrecque*, 419 F. Supp. 430, 435 (D.N.J. 1976) (citing *United States v. Coombs*, 37 U.S. 72 (1838)); *United States v. Holtzhauer*, 40 F. 76, 78 (C.C.D.N.J. 1889); *United States v. Jackson*, 26 F. Cas. 559, 561 (S.D.N.Y. 1841); *see also Davis v. United States*, 185 F.2d 938, 941 (9th Cir. 1950) (quoting *The Daniel Ball* in holding that Motorboat Act of 1940 was commerce enactment).

But the distinction between the two did not matter for those decisions, as early courts, "believing that the scope of the commerce clause power and admiralty jurisdiction were coextensive, employed the same definition of navigable waters for both."  *Adams*, 528 F.2d at 440; *see also The Daniel Ball*, 77 U.S. at 563 (applying navigability-in-fact test to what court characterized as commerce legislation); *United States v. Beacham*, 29 F. 284, 284 (C.C.D. Md. 1886) ("[C]ongress has power ... to regulate steam-boats as instruments used in navigation whenever they are used on the navigable waters of the United States.").

The Supreme Court later clarified, however, "that the extension of the judicial power of the United States to 'all Cases of admiralty and maritime Jurisdiction,'

42

Const. Art. III, s 2, cl. 1, was independent of the commerce clause." *Adams,* 528 F.2d at 440. And as time went on, the judiciary began to apply different navigability standards to the commerce and admiralty spheres. Where once the relevant test for both was navigability in fact, admiralty maintained that standard, while the commerce power first broadened its standard to historical navigability and then abandoned navigability altogether. Now, Congress's commerce power "over the waters of this Nation does not depend on a stream's 'navigability'" at all. *Kaiser Aetna*, 444 U.S. at 174.

But navigability did matter at the statutes' enactment and during most of their existence. Moreover, the navigability test used during that time was that of navigability in fact—not historical navigability. *The Daniel Ball*, 77 U.S. at 563; *see also United States v. Ross*, 74 F. Supp. 6, 7 (E.D. Mo. 1947) (employing navigability-in-fact test in criminal case charging violation of § 2302's predecessor). As a result, even if this Court were to view §§ 1115 and 2302(b) as commerce enactments (and it should not), it should apply the same navigability-in-fact standard that applied and limited their prescriptive reach at their enactment.

### 3. The government argues for an unprecedented expansion of the statutes' reach.

On appeal, the government now uses the Commerce Clause to seek an unwarranted and unprecedented expansion of prosecutorial power. In the government's view, it can apply the statutes, and especially § 1115, any time a

43

boating accident has some link to interstate commerce. *See* Br. 22. No court has contemplated such a broad criminal sweep for § 1115 or § 2302(b). The government fails to show that the statutes have ever been applied to that broad extent, or that they validly could be.

Significantly, the government cites *no* reported case in the statutes' centuries-long histories allowing a prosecution outside navigable-in-fact waters. Instead, the cases the government points to exclusively involve waters within the general admiralty jurisdiction. For example, *LaBrecque* involved the Atlantic Ocean, 419 F. Supp. at 435; *Beacham* the Chesapeake Bay, 29 F. at 285; *Holtzhauer* the Newark Bay, 40 F. at 78; and *Jackson* the East River, 26 F. Cas. at 561. This unifying feature reflects a consistent, historical use of these statutes to cover commercial activity confined to navigable in fact waters.

Applying these statutes to the full extent of the modern commerce power, as the government urges, would greatly expand federal criminal jurisdiction over intrastate activity Congress did not intend to regulate. That outcome would violate the rule that criminal statutes be strictly construed. *See Yates v. United States*, 574 U.S. 528, 547-49 (2015). It would also, without any showing of explicit congressional intent, change the balance of federal and state criminal jurisdiction over these areas. *United States v. Enmons*, 410 U.S. 396, 411-12 (1973) ("We will

44

not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.").

Such a sweeping expansion of federal power over Table Rock Lake is unnecessary and would undermine a traditional sphere of state sovereignty—the State's criminal jurisdiction over the Lake. *Bond v. United States*, 572 U.S. 844, 858-59 (2014) ("Perhaps the clearest example of traditional state authority is the punishment of local criminal activity."). The statutes' histories and contexts show that Congress did not intend to infringe on that state power based on purported effects on interstate commerce. Instead, Congress sought only to prosecute conduct on navigable-in-fact waters within the general admiralty jurisdiction. The Lake is outside that jurisdiction.

## III. The statutes do not reach the charged conduct because Table Rock Lake is outside the general admiralty jurisdiction.

The district court correctly held that the Lake falls outside the general admiralty jurisdiction under this Court's binding precedent and its own review of the relevant evidence—both of which show that the Lake is not navigable in fact under this Court's navigability standard. Either this Court's prior, on-point decisions compel this Court's affirmance, or this Court should defer to the lower court's fact finding. By no means should this Court accept the government's invitation for a full-scale, de novo review of the relevant facts. Applying either longstanding circuit

45

law or simply the appropriate standard of review, this Court should affirm that the Lake is not navigable in fact.

> **A.** **Under this Court's binding precedent, Table Rock Lake is not navigable in fact.**

The court below properly assessed that the Lake does not qualify as navigable water subject to the general admiralty jurisdiction under this Court's on-point precedent. This precedent establishing that Table Rock Lake is not navigable in fact binds this Court as well. "[I]t is a cardinal rule" in the Eighth Circuit "that one panel is bound by the decision of a prior panel." *United States v. Anderson*, 771 F.3d 1064, 1066-67 (8th Cir. 2014). In this case, *two* prior Eighth Circuit decisions bound the district court on the navigability question and support affirmance.

In *Edwards I*, the district court took judicial notice of facts showing that the Lake is not navigable in fact. *Edwards I*, 717 F.2d at 1205. The plaintiff contested those facts by submitting affidavits seeking to show "commercial activity occurs on Table Rock Lake," though he did not challenge the district court's taking judicial notice of the contrary facts. *Id.* Applying those facts to this Circuit's navigability-in-fact standard, the lower court dismissed the action for lack of admiralty jurisdiction. *Id.*

"After a careful review," this Court "uph[eld] the district court's finding of non-navigability." *Id.* In doing so, the Court was "guided by" the judicially noticed facts establishing that:

46

The recreational nature of Table Rock Lake is generally known within the territorial jurisdiction of this Court. The lake has not been susceptible of use for commercial shipping and in fact has been used *exclusively* for recreational activities. Furthermore, there is no reasonable likelihood that Table Rock Lake will become or be made navigable in the near future.

*Id.* (emphasis in original). Under these facts, this Court held, the Lake is not navigable in fact and does not fall within general admiralty jurisdiction.

Rather than "beg[] the question" as the government asserts, Br. 46, these facts show a lack of contemporary navigability in fact. The Lake was neither being used for commercial shipping, nor did it appear susceptible to such use. Instead, it was a recreational lake with no indication it could or would be used for commercial shipping in the future. *This Court's* holding in *Edwards I* alone is dispositive. Furthermore, that holding was later confirmed by a second ruling of this Court that similarly decided the Lake's lack of navigability.

In *Edwards II*, this Court confirmed its view that the Lake fails this Court's navigability-in-fact standard. 724 F.2d at 690. *Edwards II* rejected the plaintiff's untimely challenge to the district court's taking judicial notice. The Court emphasized that the district court had reconsidered its non-navigability ruling based on affidavits the plaintiff submitted. *Id.* The district court did not blindly accept the judicially noticed facts—instead, it "examined and weighed the affidavits" against those facts. *Id.* Based on this factual inquiry, the court "fairly concluded" that the submitted facts "failed to alter the court's previous characterization of Table Rock

47

Lake as a recreational body of water." *Id.* This Court sanctioned that conclusion, stating that it understood after oral argument "why the district court gave the affidavits little credence," and affirming the district court's decision that "the prevailing use of Table Rock Lake is recreational and that commercial activities on the lake" will not "alter the lake's primary recreational usage." *Id.*

These conclusions bound the district court and bind this Court as well. *Edwards I* and *II* cannot be confined to their facts or circumstances, because they relied not just on any facts but on judicially noticed facts about the same body of water. Navigability "standards and the ultimate conclusion" on navigability "involve questions of law inseparable from the particular facts to which they are applied." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 404 (1940). Some navigability determinations therefore might not be binding on cases involving different facts or distinct bodies of water. In this case, exactly the same lake is at issue. The government never explains why this Court should produce conflicting decisions about the government's ability to regulate the same body of water.

Nor does the government confront the import of this Court's reliance on judicially noticed facts that the plaintiff's contrary evidence could not overcome. Courts take judicial notice of facts that are well known and "capable of … instant and unquestionable demonstration." *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976). That the facts showing the lake's lack of navigability were judicially

48

noticed shows they were well established and accepted, so that this Court could make a direct legal conclusion about the Lake's non-navigability. Moreover, this Court adhered to this conclusion even when confronted with conflicting affidavits. That legal determination about the Lake at issue, based on unquestionably demonstrated facts about the same body of water, controls. *Dean v. Searcey*, 893 F.3d 504, 517 (8th Cir. 2018) ("[L]egal conclusions represent binding precedent.").

### B. Even assuming more than this Court's binding circuit precedent is required, Table Rock Lake is not navigable in fact.

Affirmance is also warranted even if this Court does not follow *Edwards I & II*, because the lower court's factual findings warrant deference. *United States v. Louper-Morris*, 672 F.3d 539, 559 (8th Cir. 2012) (factual findings reviewed for clear error); *see also United States v. Tucker*, 243 F.3d 499, 506 (8th Cir. 2001) ("[R]eview for clear error requires not just deference to the fact finder's views, but a very specific level of deference," accepting the district court's "account of the evidence [if] plausible in light of the record viewed in its entirety."). The district court did not exclusively rely on binding precedent—although it could have properly done so. Instead, the district court reviewed the evidence, made sufficient factual findings to support this Court's deferential review, and applied the appropriate

navigability standard to those facts.[4]  DCD90 at 83-90; Adden. A16-17.  As the district court rightly held, the evidence shows that the Lake does not satisfy this Court's standard for navigability in fact.  Neither the government's attempt to alter this standard nor its retelling of the facts reveal clear error in this decision.

### 1.  The government tries to expand the applicable standard.

The government did not establish that the Lake is navigable in fact under this Court's controlling navigability standard.  Instead, the government seeks to overturn this Court's longstanding view of contemporary navigability in fact and create a new, broader standard.  Br. 53 (asserting that this Court should adopt other courts' "broad view of navigability").

This Court defines navigability in fact as "a present capability of waters to sustain commercial shipping."  *Livingston*, 627 F.2d at 169-170; *see also Three Buoys Houseboat Vacations USA Ltd. v. Mort*s, 921 F.2d 775, 778 (8th Cir. 1990) ("*Livingston* remains the controlling authority in this court for the determination of what is a navigable waterway.").  This definition stems from the longstanding view of navigability in fact, under which waters "are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary

---

[4] The government identifies no rule or case law that required the lower court to make detailed factual findings when ruling on the motion to dismiss.  *Cf.* Fed. R. Civ. P. 52(a)(3).

Appellate Case: 20-3671     Page: 61     Date Filed: 05/24/2021 Entry ID: 5038564

modes of trade and travel on water." *The Daniel Ball*, 77 U.S. at 563. To establish susceptibility of use as a highway for commerce, a water must be currently used or likely to be used for commercial shipping in the future. *See Chapman v. United States*, 575 F.2d 147, 147 (7th Cir. 1978) (no navigability in fact where waters "are now used and likely to be used only for recreational activities"); *Adams*, 528 F.2d at 440 (same); *Livingston*, 627 F.2d at 170 (favorably citing *Chapman* and *Adams*).

The government recites this standard, but then tries to expand it in a way circuit precedent prohibits. The government argues that susceptibility for *any* commercial activity, not just commercial shipping, satisfies *Livingston*. Br. 52. But *Livingston*'s focus on "commercial shipping" is not an "offhand reference." *Id.* Commercial shipping is central to *Livingston*'s statement of, and this Court's standard for, contemporary navigability in fact. *See* 627 F.2d at 169-170; *see also Goodman v. 1973 26 Foot Trojan Vessel, Arkansas Registration No. AR1439SN*, 859 F.2d 71, 73 n.3 (8th Cir. 1988) ("Navigable waters have a present capacity to sustain commercial shipping."). Rightly so, because commercial shipping is at "the heart" of the general admiralty power and jurisdiction. *Sisson*, 497 U.S. at 362. Contemporary navigability in fact, as expressed by this Court, thus requires current or future potential for commercial shipping.

Generic "commercial" activities do not satisfy this standard. The government tries again to graft a modern commerce view onto admiralty's commercial focus,

51

arguing that the Lake's "[b]usinesses focused on recreational pursuits still engage in commercial activity," and "[t]he type of business is irrelevant to whether transportation is commercial." Br. 52. But neither the modern test for commerce authority nor the Commerce Clause more generally has any relevance to the general admiralty jurisdiction. *Supra* at 36-37. Neither do recreational activities, whatever their commercial nature. "No purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters." *Adams*, 528 F.2d at 440. This Court's focus on commercial shipping, one shared by other courts of appeals, shows that commercial but recreational activities do not establish navigability. *Id.*; *see also Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 413 (2d. Cir. 2005) (lake is navigable in fact because it "is physically capable of supporting [commercial] shipping.").

The government asks this Court to abandon its stance on navigability in fact and take instead "a broad view … finding commercial activity that is primarily or exclusively for recreational purposes sufficient for admiralty jurisdiction." Br. 53. In other words, the government urges this Court to reject not just *Edwards I* and *II*, but also *Livingston* and multiple decisions following it. *See, e.g.*, *Three Buoys*, 921 F.2d at 778. But this Court cannot abandon its precedent, which requires susceptibility for commercial shipping.

52

To adopt some of the extra-circuit authority the government points to would broaden the navigability-in-fact standard beyond any reasonable tie to the general admiralty jurisdiction.[5] *See George v. Beavark, Inc.*, 402 F.2d 977, 981 (8th Cir. 1968) ("[W]e are wary of unnecessary extension of any rule on navigability, particularly when it could well lead to absurdity."). For example, the Eleventh Circuit holds that "a waterway is navigable for admiralty-jurisdiction purposes if, in its present state, it is capable of supporting commercial activity"—apparently, of any kind. *Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 709 F.3d 1055, 1056 (11th Cir. 2013). This rule, on its face, lacks any reasonable limitation and could apply to even the most minor of "commercial" activity. That is not this Court's standard.

Nor do passing references to the Sixth Circuit's decision in *Finneseth v. Carter*, 712 F.2d 1041 (6th Cir. 1983), show that this Court has somehow sanctioned a new, broader standard. *Edwards I* did not "cite[] [*Finneseth*] favorably," Br. 54—it simply stated that *Finneseth*'s holding did not affect this Court's treatment of

---

[5] Moreover, not all of the authority the government cites supports its view that any commercial activity establishes navigability in fact. *See Morganti*, 412 F.3d at 413. And much of it consists of district court decisions, including one conclusorily finding navigability based simply on Lake Tahoe's "form[ing] a border between two states" and being "capable of supporting maritime commerce." *Cobb v. Aramark Sports & Ent. Servs., LLC*, 933 F. Supp. 2d 1295, 1298 (D. Nev. 2013); *see also Charnis v. Watersport Pro, LLC*, No. 2:07-CV-00623-RLHGWF, 2009 WL 2581699, at *2 (D. Nev. May 1, 2009) (reaching same conclusion with same limited analysis). These cases are not persuasive and cannot overrule this Court's precedent.

Table Rock Lake. *Edwards I*, 717 F.2d at 1205. And *Three Buoys* confirmed that "despite the criticisms expressed in *Finneseth … Livingston* remains the controlling authority in this court." 921 F.2d at 778. In doing so, the Court also noted that the decisions did not directly conflict, whatever the standards stated, because Table Rock Lake shows no susceptibility for use in commercial shipping and the lake in *Finneseth* did. *Id.* at 778 n.4. In other words, the Lake would not satisfy whatever standard *Finneseth* sets out, just like it does not satisfy this Court's standard.

This Court should adhere to its binding rule that navigability in fact requires capability to perform commercial shipping.

> **2. The government's tendered facts do not establish navigability in fact under the appropriate standard.**

The lower court correctly found that, even without controlling precedent, the Lake was not navigable. After "review[ing] all of the evidence submitted by the parties," the court held that without *Edwards I* and *II*, "the result would be the same"—no navigability in fact.[6] Adden. A17. It also found persuasive that the district court reached the same conclusion in the civil action. Indeed, the court earlier reviewed the "extensive record" in the civil case and held that the Lake is simply "a recreational lake used for fishing, water sports and recreation." Order, *In re Branson Duck Vehicles*, Doc. 311 at 4 (W.D. Mo. Nov. 27, 2019). It is not an

---

[6] The magistrate judge considered all evidence offered at the motion to dismiss hearing. *See, generally*, Exs. 1-35; DCD89 (Defendants' Joint Exhibit List).

interstate highway for commerce "over which trade and travel is, or could be, conducted under the customary modes of trade and transit." *Id.* Put differently, no commercial shipping presently occurs and none is likely to occur. The government identifies no clear error in these conclusions.[7]

The government instead asserts that the lake's "physical characteristics"—specifically, two interstate crossings—suffice to make it navigable in fact under *Livingston* and *The Daniel Ball*. The government again misreads the applicable standard. Physical characteristics may be relevant, but physical characteristics standing alone cannot establish a likelihood that commercial shipping will occur.[8] *The Daniel Ball* pointed to current activity by a steamer to show ongoing interstate shipping—not to hypothetically consider whether a steamer might be able to travel on the river. 77 U.S. at 564. This Court also requires more than mere physical suitability to carry freighters. *Livingston*, along with its endorsing *Chapman* and *Adams*, shows just that. *Supra* at 52-53. Nothing in the evidence the government

_____

[7] These conclusions also show that, even under the broader standard the government argues for, no navigability in fact is present.

[8] Further, the record evidence contradicts the government's view of the Lake's physical suitability for interstate shipping. For example, Exhibit B indicates that the Lake is not part of America's Marine Highway Program and is not designated by U.S. Department of Transportation or Army Corps of Engineers as a navigable inland waterway; Exhibit E identifies periodic obstructions to navigation and vertical clearance issues during floodwaters; and Exhibit K shows that areas where bridges cross Long Creek channel are either low water crossings or provide very low vertical clearances.

emphasizes establishes that the Lake is likely to be used for future commercial shipping, nor did the district court err by holding the Lake non-navigable as a result.

## CONCLUSION

For these reasons, this Court should affirm the district court's dismissal of the indictment.

Dated: May 21, 2021

Respectfully submitted,

BATH & EDMONDS, P.A.

By: /s/ Thomas J. Bath, Jr.
THOMAS J. BATH, JR., MO 45324
TRICIA A. BATH, MO 51904
10601 Mission Road
Suite 200
Leawood, KS 66206
(913) 652-9800
(913) 649-8494 facsimile
tom@bathedmonds.com
tricia@bathedmonds.com

***ATTORNEYS FOR DEFENDANT
LANHAM***

WYRSCH HOBBS & MIRAKIAN, P.C.

By: /s/ James R. Hobbs
JAMES R. HOBBS #29732
MARILYN B. KELLER #39179
One Kansas City Place
1200 Main St., Suite 2110
Kansas City, Missouri 64105
(816) 221-0080
(816) 221-3280 facsimile
jrhobbs@whmlaw.net

***ATTORNEYS FOR DEFENDANT
McKEE***

-And-

JOHNSTON LAW FIRM LLC

By: /s/ J. Justin Johnston
J. JUSTIN JOHNSTON, MO 42701
811 Grand Blvd., Suite 101
Kansas City, MO 64106
(816) 739-4538
(816) 221-3280 facsimile
jjj@johnstonlawkc.com

***ATTORNEY FOR DEFENDANT
BALTZELL***

56

## CERTIFICATE OF COMPLIANCE

1.     I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,981 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure a32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point size Times New Roman font.

3.     This brief has been scanned for viruses, and the brief is virus free.

*/s/ J. Justin Johnston*

57

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2021, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ J. Justin Johnston*

Appellate Case: 20-3671     Page: 69     Date Filed: 05/24/2021 Entry ID: 5038564